**Opinion issued April 25, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-01052-CV

————————————

## IN RE G.A.A., A CHILD

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2011-05565J

## MEMORANDUM OPINION

Appellant, J.S.E., appeals the trial court's termination of her parental rights to her child, G.A.A. In four issues, she argues that the evidence was legally and factually insufficient to support termination of her parental rights pursuant to Family Code sections 161.001(1)(D),(E), (O), and (P) and that her trial counsel

was ineffective for failing to move to dismiss the suit when the trial on the merits was held after the statutory dismissal date.

We affirm.

## Background

J.S.E. gave birth to G.A.A. on April 12, 2006. He was born prematurely and suffers from multiple health problems, including cerebral palsy, seizures, and hydroencephalitis. This termination suit arose out of a report received by the Department of Family and Protective Services ("DFPS") on September 8, 2011, that G.A.A. "was found with bruises on his legs and buttocks." DFPS filed its original petition for protection of G.A.A. and termination of J.S.E.'s parental rights on September 9, 2011.

According to the affidavit of caseworker Misty Brown, filed with the petition in the trial court, the person making the report told DFPS that "[J.S.E.] admitted that she spanked [G.A.A.] with a shoe because he would not stop touching his finger to his teeth which caused his mouth to bleed and he knows better." Brown also averred that G.A.A. had a seizure on September 7, 2011, and "[a]ccording to [J.S.E.], she stated that she had stopped hitting [G.A.A.] on his feet and arms because he does not respond. [G.A.A.] is not verbal or mobile." Finally, Brown reported that "[t]he mom is said to smell like marijuana at times and to have shot the child in the past with a BB gun in the eye."

2

Brown averred that she observed bruises on G.A.A.'s legs and buttocks. In the course of her investigation, Brown talked with the home health nurse, Rhonda Allen, who made the following report to DFPS: J.S.E. "admitted that she spanked the child for poking his teeth with his fingers" and told Allen "that if she [J.S.E.] comes home and the child has blood in his mouth or something else that she [J.S.E.] is going to give him (the child) more than bruises"; Allen was concerned "about the mother giv[ing] the child too much medication in an effort to control his behavior"; G.A.A. did not have a wheelchair or other proper equipment; and "there are medicines that the child needs that are not being given to him."

Brown further averred that she contacted J.S.E., who "admitted to spanking the child with a shoe because he was digging in his eye and poking his teeth with his fingers. [J.S.E.] stated that he (the child) knew what he was doing and he knew it was wrong. [J.S.E.] was very hostile with [Brown] as well as the police officer and the nurse. She then refused to answer any other questions." Brown transported G.A.A. to Texas Children's Hospital for evaluation, and the physician indicated that the bruises were "consistent with abuse." The physician's report was attached to Brown's affidavit and filed with the trial court.

Brown also stated that J.S.E. had an extensive history with DFPS. In 2006, DFPS investigated J.S.E. for "not following up with doctor's orders in regards to [G.A.A.'s] medical condition." After investigation, the report was "ruled out with

3

risk indicated," J.S.E. was referred for family based services, and, "upon completion of services," the case was closed. In 2007, DFPS investigated allegations that "there was a controlled substance found in the presence of the child" and that J.S.E. "was not following through with medical care for the child." G.A.A. was hospitalized for several days, DFPS found "reason to believe" the allegations, and G.A.A. was "placed in care in Nueces County." Twice in 2009, DFPS received allegations regarding J.S.E.'s neglect of G.A.A. that were "investigated and ruled out." In January 2010, "it was recommended that [G.A.A.] be admitted to the hospital for observation at the doctor's request and the mom refused and left. It was alleged that the mom does not understand the severity of the situation and [was] not being protective. The case was investigated and administratively closed." In August 2010, J.S.E. allegedly "accidentally shot the child with an air gun in which the child sustained a red mark to [a] vital area." The police investigated, and a second referral came in during that investigation alleging that J.S.E. "places the child at substantial risk of harm due to inadequate supervision." Regarding the investigation, Brown averred that J.S.E. "appears to have shot the child in the eye with a pellet gun but stated that she was not aware that it was loaded. The mom admitted that she frequently aims the empty gun at the child. The case was investigated" and DFPS found there was "reason to believe" the allegation.

The trial court granted DFPS temporary sole managing conservatorship of G.A.A. and set a full adversary hearing for September 22, 2011. The trial court also determined that "[p]ursuant to § 263.306(11), Texas Family Code," the date for "dismissal of this cause shall be" September 10, 2012.

At the September 22, 2011 hearing, Brown and Allen testified regarding the information contained in the affidavit. Brown testified that she observed bruising on G.A.A.'s thighs and buttocks. She testified that J.S.E. admitted striking G.A.A. with a shoe, and Brown also expressed concerns regarding J.S.E.'s over-medication of G.A.A., J.S.E.'s "threat" to "whoop" G.A.A. "even more," and J.S.E.'s history with DFPS regarding allegations of medical neglect and neglectful supervision. Brown also testified regarding DFPS's investigation into the allegation that J.S.E. accidentally shot G.A.A. in the eye with a pellet gun. Allen testified that she observed bruises on G.A.A. that could not have been self-inflicted, that J.S.E. admitted she gave G.A.A. the bruises by hitting him, and that J.S.E. threatened to "do more than bruise" him if he scratched himself any further. Allen also stated that J.S.E. refused to allow Allen to administer necessary medication to G.A.A., which Allen believed was a form of abuse.

J.S.E. also spoke on the record at the September 22, 2011 hearing. She stated that she "did pop [her] child. It wasn't beating. It wasn't no continuous hitting. It was a pop to startle him." She stated that G.A.A. would hurt himself

5

and that she was attempting to restrain him from further self-injury. The trial court appointed DFPS as G.A.A.'s temporary managing conservator and approved his placement in a therapeutic foster home.

On March 6, 2012, the trial court held the first permanency hearing. DFPS caseworker Wesley Hollis testified that G.A.A. would soon be turning six years old, that he had cerebral palsy, respiratory distress, and a history of seizures, although "he hasn't had any since he's been in care." Hollis also testified that G.A.A. had been born prematurely and that he had "failure to thrive" and congenital hydroencephalitis. He also stated that his therapeutic foster home was a good placement and that G.A.A. was "doing great."

The trial court ordered DNA testing of G.A.A.'s purported father, G.A. Hollis further stated that J.S.E.'s mother was denied as a possible placement for G.A.A. because she lacked transportation and income, which she would need "considering [G.A.A.]'s medical needs." Hollis testified that J.S.E. had signed her family service plan, but she had not begun working the services. Hollis further stated that J.S.E. was not cooperating with DFPS and that J.S.E. had the knowledge to care for G.A.A.'s medical conditions but "she doesn't want to follow the doctors' directives in regards to arguing with me and regards to how we're taking care of" G.A.A. G.A.A.'s child advocate and attorney ad litem both informed the

trial court that they had observed G.A.A. and he was doing well in his current placement. The following exchange then occurred:

> [J.S.E.'s counsel]: Could the Court admonish the mother, Your Honor? She refuses to work the service plan and—
>
> . . . .
>
> [The Court]: Well, I don't know. What am I supposed to tell her, work the service plan?
>
> [J.S.E.'s counsel]: Or her rights could be severely restricted.
>
> [The Court]: I think she knows that.
>
> [J.S.E.]: Oh, yes, ma'am. I have dealt with this for quite awhile. Too long. Thank you very much.
>
> [The Court]: Okay. She knows.

On June 28, 2012, the trial court held a second permanency hearing at which caseworker Cheryl Baltazar testified. Baltazar testified that DNA testing revealed that G.A. was not G.A.A.'s father. DFPS asked the trial court for a partial nonsuit as to G.A., and the trial court stated on the record that the motion for nonsuit was granted. Baltazar testified that she had been unable to discover whether there were any criminal charges being filed on J.S.E. Baltazar stated that J.S.E. "has not completed anything on the family plan of service" and that she "has been sent to do several [random urinalysis drug tests] and they were all no shows." G.A.A.'s attorney ad litem also reported that G.A.A. had been moved to a new foster home

7

because the previous caregiver stated that she did not intend to be a permanent placement. The new foster mother was familiar with G.A.A. because she had cared for him "on a prior CPS case"; she was an appropriate caregiver; and it was "a good placement for all purposes." She also discussed various efforts to locate and evaluate relatives who might care for G.A.A.

On August 30, 2012, the parties appeared before the trial court, and DFPS stated that it was ready for trial. The trial court stated that it had September 4, 2012 noted as the trial setting. DFPS informed the trial court that the trial date had been changed to August 30, 2012 after the previous hearing and was supposed to have been changed on the docket sheet.

J.S.E.'s attorney sought a continuance because J.S.E. had signed an affidavit of relinquishment but had failed to have it witnessed or notarized and had left the court. DFPS stated again that it was ready to proceed, but the trial court stated, "I'm just concerned [J.S.E.] was here; she signed a relinquishment. She meant to relinquish her rights. Did anyone talk to her?" The child's attorney ad litem stated that she talked with J.S.E., who "was quite upset" and "asked if she could speak to her attorney again." However, the ad litem stated that J.S.E.'s attorney was unavailable at that time because she had "go[ne] upstairs to another court," so the ad litem "attempted to text her attorney." J.S.E. "waited and waited and then she just was upset." J.S.E. left, and her attorney subsequently returned to the

8

courtroom and noticed the problem with the affidavit. The trial court asked if anyone could contact J.S.E. and let her know that the relinquishment "wasn't done right. If she intends to relinquish, she needs to come back and do it." The trial court further indicated that the improper relinquishment was "the reason why we can't do [the final hearing] today." The trial court then stated that it was "going to do a partial nonsuit on [G.A.] today."

The following exchange then took place:

[DFPS's counsel]: I'll get you an order on that. Judge, if we do that, can we say that the trial has opened since mother was here this morning? Say trial was opened and we can reset it to a day after 9-10?

[The Court]: Let's just do that.

[DFPS's counsel]: How about Tuesday, 10-9?

[J.S.E.'s counsel]: That's fine for me, Judge.

[The Court]: 10-9?

[DFPS's counsel]: Right. For the record, the record will show that the trial opened today because the dismissal date is before that date. The dismissal date is 9-10. Judge, we opened the trial. Everyone is ordered back 10-9-12; is that correct, Your Honor?

[The Court]: Yes. All right. Thank you.

The trial court signed an order that included a notation that the "trial opened today and was recessed to 10/9/12."

9

The trial reconvened on October 9, 2012. J.S.E. did not attend the trial. The case worker, Cheryl Baltazar, testified that DFPS received a report regarding G.A.A. She testified about his medical conditions, including that he has cerebral palsy and frequent seizures and also suffers from convulsions, hydroencephalitis, and failure to thrive. To treat these conditions, he had a shunt in his head and a feeding tube. Baltazar agreed that G.A.A. is "very severely disabled," and she testified that, at the time of trial, "he's improving."

Regarding the circumstances that led to G.A.A.'s being removed from J.S.E.'s care, Baltazar testified that J.S.E. told her that she would "whup [G.A.A.] when he put his finger in his mouth and make his gums bleed" and that J.S.E. told the nurse that she would "continue to whup him" if he continued putting his fingers in his mouth. Baltazar also testified that J.S.E. admitted hitting G.A.A. with a shoe and said that she would continue to do so "as long as he continues to misbehave." J.S.E. told DFPS that that was the only way she could control G.A.A. Baltazar testified that she felt this constituted abuse. Baltazar further testified that, based on his medical condition at the time of removal, she believed G.A.A. was also neglected.

Baltazar testified that J.S.E. "refused to go to any of the random UAs that [were] offered by CPS" and, thus, she had refused approximately eight drug tests. DFPS presented a September 22, 2011 drug report showing that J.S.E. tested

10

positive for marijuana use and a March 6, 2012 report showing that J.S.E. tested positive for cocaine and marijuana metabolites and for alprazolam (Xanax). Baltazar testified that, following J.S.E.'s positive drug test on September 22, 2011, the trial court suspended her visitation with G.A.A. until she had a clean drug test, but J.S.E. never submitted a clean drug test.

Baltazar also stated that she had problems communicating with J.S.E. She testified that when she last spoke with J.S.E., a week before trial, J.S.E. asked that her boyfriend receive custody of G.A.A., but he did not qualify as a caregiver for G.A.A. Likewise, the maternal grandmother's home study was denied, and the home study of J.S.E.'s sister "fell through" when the sister failed to come meet G.A.A. to "get a feel for him to see if that was something she would be able to do, take care of a special needs child."

Baltazar testified that his current foster placement had a history with G.A.A. from the first time he came into DFPS care at two months of age and that his caregiver "really has grown very close to him" and wished to adopt him. His current foster care provider was able to handle G.A.A.'s special needs.

Baltazar stated that J.S.E. failed to cooperate with DFPS or complete her family service plan. J.S.E. did not complete her psychosocial evaluation because "[s]he was very frustrated and agitated and the interviewer could not assess her and she wasn't cooperating. So, she just discontinued the assessment." J.S.E. likewise

11

refused to complete her psychiatric evaluation, her substance abuse assessment, and her anger management classes. J.S.E. was also asked to attend a parenting class, but she never presented DFPS with a certificate of completion. Baltazar further testified that J.S.E. did not cooperate with attempts to obtain her address and set an appointment to visit J.S.E.'s home to determine whether it was appropriate for G.A.A.

DFPS also presented evidence that J.S.E. had a criminal record including: a plea of nolo contendere in 2005 to criminal trespass, a guilty plea to assault involving family violence on August 1, 2006, and multiple other arrests. Baltazar testified that J.S.E. had an aggravated assault charge in 2010.

In its final decree for termination, the trial court found the J.S.E. violated Family Code subsections 161.001(1)(D), (E), (O), and (P) and that termination of J.S.E.'s parental rights was in G.A.A.'s best interest. The trial court signed the final decree on October 25, 2012.

**Standard of Review for Termination of Parental Rights**

In a case to terminate parental rights brought by DFPS under section 161.001, DFPS must establish, by clear and convincing evidence, (1) that the parent committed one or more of the enumerated acts or omissions justifying termination and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2012); *In re C.H.*, 89 S.W.3d 17, 23 (Tex.

12

2002). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2008); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002); *see also Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985) (holding that because termination of parental rights "is complete, final, irrevocable, and divests for all time that natural right . . . [,] the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights") (citing *Santosky v. Kramer,* 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

In conducting a legal-sufficiency review in a parental-rights-termination case under Family Code section 161.001, we must look at all the evidence to determine whether the evidence viewed in the light most favorable to the finding is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.F.C.*, 96 S.W.3d at 266. We "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266; *see also Jordan v. Dossey*, 325 S.W.3d 700, 712–13 (Tex. App.—Houston [1st Dist.] 2010, pet.

13

denied) (when legal sufficiency of evidence in parental rights termination suit is challenged, reviewing court should look at all evidence in light most favorable to finding to determine whether reasonable trier of fact could have formed firm belief or conviction that its finding was true, disregarding all evidence that reasonable fact finder could have disbelieved or found incredible, but not disregarding undisputed facts that do not support finding, as doing so could skew analysis of whether there is clear and convincing evidence that matter that must be proven is true).

"[T]ermination findings must be upheld against a factual sufficiency challenge if the evidence is such that a reasonable jury could form a firm belief or conviction that grounds exist for termination under Texas Family Code sections 161.001 and 161.206(a)." *In re C.H.*, 89 S.W.3d at 18–19. To reverse a case on insufficiency grounds, "the reviewing court must detail the evidence relevant to the issue of parental termination and clearly state why the evidence is insufficient to support a termination finding by clear and convincing evidence." *Id*. at 19. In *In re C.H.*, the supreme court emphasized that, in applying the "clear and convincing" evidence standard, the appellate courts "must maintain the respective constitutional roles of juries and appellate courts." *Id*. at 26. In that regard,

> An appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt. . . . While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to

recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.

*Id.* (citation omitted).

DFPS must establish both elements—that the parent committed one of the acts or omissions enumerated in section 161.001(1) and that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. §161.001; *In re C.H.*, 89 S.W.3d at 23. Termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). However, "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Thus, if multiple predicate grounds are found by the trial court, we will affirm on any one ground because only one is necessary for termination of parental rights. *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.); *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.).

### Termination Under Subsections 161.001(1)(D) & (E)

In her first issue, J.S.E. argues that the evidence supporting the trial court's termination of her parental rights to G.A.A. under subsections 161.001(1)(D) & (E) was legally and factually insufficient.

Subsection 161.001(1)(D) provides that a court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. . . ." TEX. FAM. CODE ANN. § 161.001(1)(D).

Subsection (D) requires a showing that the environment in which the child was placed posed a danger to the child's physical or emotional health, and it permits termination based on a single act or omission by the parent. *Jordan*, 325 S.W.3d at 721; *In re L.C.*, 145 S.W.3d 790, 795–96 (Tex. App.—Texarkana 2004, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *Jordan*, 325 S.W.3d at 721; *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Thus, although the focus of subsection (D) is on the child's living environment and not on the parent's conduct, parental conduct may produce an endangering environment. *See Jordan*, 325 S.W.3d at 721; *In re D.T.*, 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied). For example, abusive or violent conduct by a parent or other resident of the child's home, as well as illegal drug use and criminal activity, support a

16

conclusion that the child's surroundings endanger his physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

Subsection 161.001(1)(E) provides that a parent's rights can be terminated when she has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(E).

"Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act." *In re J.T.G.*, 121 S.W.3d at 125; *see also Jordan*, 325 S.W.3d at 723 ("The relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being."). In this context, endanger means "to expose to loss or injury; to jeopardize." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Boyd*, 727 S.W.2d at 533); *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.). A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *Jordan*, 325 S.W.3d at 721; *In re M.R.J.M.*, 280 S.W.3d at 502.

Termination under subsection 161.001(1)(E) must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent. *Jordan*, 325 S.W.3d at 723; *In re*

17

*J.T.G.*, 121 S.W.3d at 125. "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re T.N.*, 180 S.W.3d at 383 (citing *In re M.C.*, 917 S.W.2d at 269); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (holding that endangering conduct is not limited to actions directed toward child). Danger to the child's well-being may be inferred from parental misconduct alone, and courts may look at parental conduct both before and after the child's birth. *In re J.O.A.*, 283 S.W.3d at 345 ("[T]he endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage."); *Jordan*, 325 S.W.3d at 723 (holding that danger to child need not be established as independent proposition and may be inferred from parental misconduct even if conduct is not directed at child and child suffers no actual injury). The conduct need not occur in the child's presence, and it may occur "both before and after the child has been removed by [DFPS]." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

As a general rule, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *see also Jordan*,

325 S.W.3d at 724 ("Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child."). Furthermore, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345; *see also In re T.N.*, 180 S.W.3d at 383 ("A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children."). Illegal drug use may support termination under subsection 161.001(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617.

Here, Baltazar testified that J.S.E. admitted that she would "whup" G.A.A., who is severely disabled, because he would poke his fingers in his mouth and make his gums bleed. J.S.E. further admitted that she had struck G.A.A. with a shoe, resulting in bruising to his legs and buttocks, and that she would continue to strike him as long as he continued to misbehave. *See Jordan*, 325 S.W.3d at 724 ("Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child."); *In re J.T.G.*, 121 S.W.3d at 125 (holding that abusive or violent conduct by parent supports conclusion that child's

19

surroundings endanger his physical or emotional well-being pursuant to subsection 161.001(1)(D)).

Additionally, DFPS presented evidence of J.S.E.'s drug use in the form of two positive drug tests and multiple missed tests. *See Walker*, 312 S.W.3d at 617 (holding that illegal drug use may support termination under subsection 161.001(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned"). DFPS also presented evidence of J.S.E.'s criminal activity, including an assault that involved family violence the year G.A.A. was born, a subsequent assault allegation in 2010, and multiple other arrests. *See In re J.T.G.*, 121 S.W.3d at 125 (holding that illegal drug use and criminal activity support conclusion under subsection 161.001(1)(D) that child's surroundings endanger their physical or emotional well-being).

Thus, we hold that the evidence was legally and factually sufficient to support the trial court's termination of J.S.E.'s parental rights pursuant to subsections 161.001(1)(D) & (E).

Accordingly, we do not need to determine whether the evidence was sufficient to support termination under subsections 161.001(1)(O) or 161.001(1)(P). *See In re A.V.*, 113 S.W.3d at 362 (holding that trial court only needs to make one finding of parental misconduct under Family Code section

161.001(1)).  J.S.E. does not challenge the trial court's finding that termination of her parental rights was in G.A.A.'s best interest.

We overrule J.S.E.'s first, second, and third issues.

## Ineffective Assistance of Counsel

In her fourth issue, J.S.E. argues that her trial counsel was ineffective. Indigent persons have a statutory right to counsel in parental-rights termination cases.  TEX. FAM. CODE ANN. § 107.013(a)(1) (Vernon Supp. 2012).  This includes the right to effective counsel.  *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003).  We follow the two-pronged standard set forth in *Strickland v. Washington* to determine whether counsel in a parental-rights termination case was effective.  *Id.* at 545 (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984)).  Thus, to show ineffectiveness of counsel in a termination case, the appellant must show that (1) counsel's assistance fell below an objective standard of reasonableness and (2) counsel's deficient assistance, if any, prejudiced her.  *Id.*

In determining whether counsel's conduct fell below an objective standard of reasonableness, we must consider all circumstances surrounding the case and determine whether counsel was "reasonably effective."  *Id.*  We give great deference to counsel's performance, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065).  We will

21

find counsel's performance deficient only if counsel's conduct was "so outrageous that no competent attorney would have engaged in it." *Id.* In conducting the harm analysis under *Strickland's* second prong, we must determine whether there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *Id.* at 550. Any allegation of ineffective assistance must be fully supported by the record. *Doe v. Brazoria Cnty. Child Protective Servs.*, 226 S.W.3d 563, 572 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

Here, J.S.E. argues that her counsel was ineffective for failing to move to dismiss the suit when the trial on the merits was held after the statutory dismissal date. Family Code section 263.401 provides:

> Unless the court has commenced the trial on the merits or granted an extension under Subsection (b), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court shall dismiss the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child.

TEX. FAM. CODE ANN. § 263.401(a) (Vernon 2008). The trial court may, however, extend the deadline for dismissal for up to 180 days, and it must dismiss the suit if trial has not commenced on or before the new dismissal date. *Id.* § 263.401(b)–(c).

Section 263.402 prohibits the parties from extending the dismissal deadline by agreement, but it provides that the deadline can be waived:

22

A party to a suit under this chapter who fails to make a timely motion to dismiss the suit under this subchapter waives the right to object to the court's failure to dismiss the suit. A motion to dismiss under this subsection is timely if the motion is made before the trial on the merits commences.

*Id.* § 263.402(b) (Vernon 2008).

Here, J.S.E. argues that the trial did not commence on August 30, 2012, as DFPS argues, because no evidence was admitted and the only action taken on that date—the nonsuit of G.A.—had already occurred at the June 28, 2012 permanency hearing. J.S.E. asserts that DFPS's efforts to establish that the trial opened on August 30, 2012 are a pretext and were designed to thwart the public interest embodied in Family Code section 263.401. J.S.E. argues that her trial counsel was ineffective for failing to move to dismiss the case before trial commenced on October 9, 2012.

We conclude that J.S.E. has failed to establish that her counsel's failure to move to dismiss was "so outrageous that no competent attorney would have engaged in it." *See In re M.S.*, 115 S.W.3d at 545. Because DFPS filed its original petition seeking termination of J.S.E.'s parental rights to G.A.A. on September 9, 2011, the dismissal date pursuant to Family Code section 263.401 was September 10, 2012. *See* TEX. FAM. CODE ANN. § 263.401(a). However, the trial court was authorized to extend the deadline for dismissal for up to 180 days. *See id.* § 263.401(b). Assuming, without deciding, that trial did not open until October 9,

23

2012, as J.S.E. argues, we observe that October 9, 2012 falls within the 180-day period for which the trial court could have granted an extension and, thus, we cannot conclude on this record that J.S.E.'s counsel's failure to file a motion to dismiss fell below an objective standard of reasonableness. *See In re M.S.*, 115 S.W.3d at 545 (holding that we must indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"); *Doe*, 226 S.W.3d at 572 (holding that any allegation of ineffective assistance must be fully supported by record).

We overrule J.S.E.'s fourth issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Sharp, and Huddle.